Albers v. Guthrie-Renker, submitted on the briefs. S.E.C. v. Gemstar, Henry C. Yuen. May it please the Court, Michelle Rice on behalf of Henry Yuen and Elsie Leone. I'd like to reserve, if I might, five minutes of my time. Section 1103 is a powerful and troubling statute that authorizes a pre-complaint seizure of assets by the S.E.C. on the slimmest of evidentiary showings. To obtain a seizure, the S.E.C. need only demonstrate that there is a lawful investigation and that extraordinary payments are about to be made. Why do you say slimmest? Where is the evidence that there was any extraordinary – any evidence of extraordinary payments? Well, we submit, Your Honor, that there was no evidence submitted of extraordinary payments. So slimmest means none. Slim – we do believe that under certain circumstances, an evidentiary showing should be made, but in this case there was none. That's correct. To obtain a seizure, the S.E.C. need only – I'm sorry. The most significant problem with Section 1103 results from its key phrase, extraordinary payments, which even the district court acknowledged was unclear and inadequate and or inadequate. Relying solely on a dictionary definition, the S.E.C. asserts that an extraordinary payment is a payment that is unusual in some way. The district court rejected that interpretation, but relying on the legislative history, found that extraordinary payments means certain payments and that any number of factors might render a payment extraordinary. The district court did not, however, provide any guidance as to what those factors might be. Significantly, neither of these interpretations appears to require any connection to a violation of the securities laws or any connection between a violation of securities cause – laws and the payments to be seized. Nor do any of these approaches take into account the one unmistakable theme in the unwarranted payments, payments that are pilfered, to use a term – to borrow a term from the legislative history, and payments that are somehow increased in the course of an S.E.C. investigation. How would you ever express this concept in more specific terms without creating a thousand loopholes? I mean, it seems that the more specific you get, the more opportunities you have for people to do exactly what Congress doesn't want them to do. Well, it seems to us that Section 1103 should probably cover two areas. The first area would be, as I suggested previously, which is if they can show that – if they can show, provide proof that there's been a violation of the securities laws and that the payments at issue had some connection there to that violation of securities laws, that might be one basis that one could get a phrase under Section 1103. Show or create probable cause or something like that? Put in some evidence of both of those. You know, it's cart and horse. I mean, this is early in the game, and they're trying to hold on to the dough before their investigation. If you have to show the result of the investigation before you can hold on to the dough, it's too late. Well, in this case, Your Honor, they had six months. They had six months to investigate both of my clients. They presumably, if they had had evidence of the securities laws violation at the time, they would have put it in. And if they could establish, for example – I'll use one of the district court examples – if they could have demonstrated that somehow during the course of the investigation, a payment of some sort was approved by a board of directors and given to one or both of my clients, they could show that the way that they got that payment was somehow improper. So, for example, a board member was bribed and approved the payment, or you could establish that there was absolutely no consideration for the payment. There are scenarios that could have been posited which were not posited in this case. Would it be sufficient, counsel, if they had proved any of the allegations of the complaint which go into the Tribune transaction, the Motorola transaction, and the rest of them, which seem to pump up the operating income of Genstar for the purpose of getting sizable bonuses to U.N. and land? If they could establish both that the transactions had the effect – you know, the transactions of which you spoke had the effect of a violation of securities laws, and they could establish – At least at a primefacial level. Put in some evidence. And establish that my clients were responsible for that violation, and further establish that the money in some way resulted from that violation. I think they would have or could meet their evidentiary burden. They did none of those things. They made the barest of allegations that my clients may have engaged in a securities fraud. They didn't even say they did. They said they may have engaged in a securities fraud. They put in evidence that my clients have incentive contracts, as do many employees both at that company and every other company. Well, let me ask you on that. Was there any evidence as to what anybody else did? You just said, as do many people have. But was there any evidence of what other persons have in this or any similar industry? Absolutely no. I didn't think so. They offered no evidence with respect to anyone other than my clients. And as to my clients, they only put in the contracts. And they said, see, there are incentive provisions. They didn't discuss in what respect those incentive provisions would have had the effect of providing my clients improper payments or inflated payments. There was no evidence whatsoever. The allegation is, of course, that your clients consciously manipulated the income and operating expenses or allocation of income between capital transactions and operating income so as to falsely balloon the very basis upon which they would be getting payments. That's the allegation, right? That's the allegation that was made subsequent to this hearing in a complaint. A complaint is not evidence, but that is the allegation that was made subsequent to here. In this case, in this hearing, the allegation that was made was that they may have engaged in a securities law violation. What if we were to read some kind of likelihood of success on the merits requirement into this? Would that be exceeding our power, or would that be appropriate? Well, it's certainly appropriate and done in the course of a traditional asset freeze. Right. Which would be filed post-compliance. Right. Would that be appropriate here? We believe if you put the statute aside. I should first say the statute is absolutely silent as to that. There is no guidance in the legislative history or anywhere else. That's what was intended. That's why I'm wondering whether we'd be out of our power as a judiciary to read something that specific into a statute or whether that would be up to Congress. But it seems that if you look at all the traditional approaches to this, there's some kind of a requirement similar to that that attaches to these kinds of things. And here, you're just out there in nowhere land. Absolutely true. And indeed, in all of the traditional asset freezes under securities laws and otherwise, there is that requirement, but that requirement is generally stated on the face of. Right. Or in certain cases, I believe it is probably read in as well. Isn't that requirement exactly what the district court in Alabama read into the act in SEC versus HealthSouth? In the HealthSouth case. The HealthSouth case did not – I believe they stipulated to a 1103 escrow. I don't believe they actually litigated the issue of the 1103 escrow. In the other – there was an asset freeze, I believe, in that case, but it probably was a traditional asset freeze and as a result did read in the requirement of a likelihood of success on merit. Traditional asset freeze under a temporary injunction. I believe it was under the securities laws generally, not under this particular case. But the court did find that they couldn't grant the relief requested by the SEC on any other basis than the traditional one. In other words, it didn't use 1103. That's my understanding of the HealthSouth case. Pardon me. Because of Section 1103's lack of clarity, the district court erroneously concluded that the payments at issue were extraordinary for three reasons. The first reason they used was that it was the product of negotiation. The second reason relied upon by the district court was that these payments were connected to a restructuring of GEMSTAR, and the third reason relied upon by the district court was that the payments were large. But the SEC did not seek to prove and the district court did not find, first, that the negotiation of payments such as these would be extraordinary or aberrant as a matter of corporate practice. The SEC did not seek to prove and the district court did not find that the making of severance payments in connection with the management departure would be extraordinary or aberrant as a matter of corporate practice. Well, as I remember, there was no comparative evidence to show how long it took to negotiate the departure of any other employees or officers or directors of similarly  That's exactly right, Your Honor. And that was also true as to the second and third elements, as to restructuring and as to the largeness of the payments. It seemed to me that the only basis upon which the government charged the payments were large, and Judge Burns, from which I have a great deal of respect, found the payments to be large, is some unarticulated, and to use the language of Judge Wiggins, irreducibly subjective, basis on which is inarticulated. That's absolutely correct. They didn't even look at, Your Honor, whether this would have been large relative to the assets of Gemstar. Or the income or anything else. Or anything else. Finally, the district court compounded this error by rationalizing its ruling in an unfair and contradictory way. On the one hand, the court refused to credit the only evidence that was offered as to the makeup of the payments. That evidence established that there were four components to these restructuring payments, excuse me. Salary, bonuses, severance, and vacation pay. That evidence also established that these four components had derived from contracts predating both the SEC investigation and the enactment of the Sarbanes-Oxley Act. The district court simply disregarded that evidence. At the same time, the court found that the appellants engaged in or said that the appellants engaged in wrongdoing, stating, and this is a quote from the court, it must view the payments with a skeptical eye. And he went on to say, because the financial performance of Gemstar is alleged to have been inflated, and appellants' entitlements enhanced thereby. Aside from the complete absence of evidence of wrongdoing in this record, the district court failed to recognize that a substantial portion of these payments is not tied in any way to the financial performance of Gemstar. There was no connection whatsoever, because a certain portion of these payments is tied directly to appellants' salaries, which have annual irreducible minimums of $1 million and $700,000, respectively. In other words, for Dr. Ewan's severance package, for example, which is a $1 million severance package, which was 5 times salary or so 1 million times 5, which would be 5 million, has no connection whatsoever to the performance of Gemstar. He would have gotten it whether Gemstar's revenues went up or went down. Same is true for Ms. Lund's severance package, which was 4 times salary. $2.8 million or 4 times the $700,000 minimum salary she was entitled to get has no connection whatsoever to the financial performance of Gemstar. But, Counsel, do you concede that the balance was connected to performance, the balance of the amounts paid? No, I don't concede that, Your Honor. I was just using that by way of example. The vacation pay, for example, was also tied to salary. So a portion of the vacation pay also has nothing whatsoever to do with the financial performance of the company. I think what Judge Rollins was asking is you concede that the $22 million to U.N. and the $6.9 million to Leung as termination pay was tied to performance, at least projected performance. There is some portion of those payments that is tied in some part to performance. I do agree with that. And that has to be projected performance. And that's what Judge Byrne said he was viewing with a skeptical eye. Exactly. Did that skeptical eye include any actual testimony as to how the computation was made by either the government or you? We put in what the payment we put in evidence. We put in the only evidence on this point, frankly. We put in evidence as to what they were entitled to under the 1998 agreements. And then we put in evidence as to how those amounts were compromised, to the extent they were compromised. And did the government present any evidence giving the results of a skeptical eye? No, Your Honor. The district court also erred by failing to conclude that Section 1103 is void for vagueness. While acknowledging Section 1103's lack of clarity and meandering boundaries, to use the district court's terms, the court substituted an even less intelligible phrase, certain payments, for the sole operative term, extraordinary payments. Based on this substitution, the district court found that Section 1103 provides notice of what conduct is prohibited. Counsel, are you challenging the statute on its face or as applied? Well, our challenge in our papers was certainly to both on its face and as applied. Do you have standing to challenge the statute on its face? We believe we do, Your Honor, because as enforced. There are two elements to a facial challenge. No, I understand. But as I read the cases concerning a facial challenge to this statute, it would have to provide notice of what conduct is prohibited. And it would have to provide sufficient protection against arbitrary enforcement of the statute. What about the cases that talk about standing to challenge a statute on its face? What's your best case authority for the proposition that you have standing to bring a facial challenge? Well, I understand. If I'm hearing you correctly, Your Honor, I understand that your concern would be that, but given that there's no First Amendment implication or what have you. Verdi. But as I understand Ninth Circuit, and I think it's the Purdy case, that if we can establish that as applied to us in this case, it would still be a valid challenge to this statute, if under the circumstances under this case. But in any event, we can establish that it was unconstitutional as applied to us under the Chalmers decision. And I will go to that. In that respect, the Court ignored telling circumstances of this case. In particular, that appellants unsuccessfully sought to clarify the ambiguities in Section 1103 before they agreed to the restructuring which resulted in the restructuring payments that are at issue here. In the Chalmers case, this Court held that due process violation occurred in the implementation and enforcement of two conflicting municipal ordinances because the plaintiff had sought to clarify the ambiguities in those ordinances before engaging in the activities for which he was later threatened. Scalia. That's the Pushkar case. That's the Vending the Vendor case. Yes, Your Honor. The holding in Chalmers is based on this Court's finding that the, and I quote, the plaintiff did all she could reasonably be expected to do in determining the city's requirements before engaging in her occupation, even to the point of requesting clarification of the conflicting and vague ordinances. Here, appellants did everything they could reasonably be expected to do in determining the scope of Section 1103 before making a business decision to close this restructuring. Counsel, wasn't Chalmers a little different in that there were conflicting opinions from different representatives of the government? It is true. In Chalmers, there were conflicting ordinances, and she did receive an opinion that what she wanted to do was okay. We don't think that is a significant difference because the Court focused not on the fact that they were conflicting, but on the fact that the person who would have been subjected to regulation under the statutes did all that they could do to ascertain the meaning of the statute before they engaged in the conduct for which they were later, which she was later threatened with arrest. Here, the appellants did engage in an extensive dialogue with the SEC prior to the payments would be treated as extraordinary payments. Were there any representations made by officials from the SEC regarding their opinion, the opinion of the SEC on the restructuring agreement? The opinion of the SEC concerning the payments themselves was the following. When we first spoke to the SEC in early October, they said, we don't know what this statute means. We have yet to write any regulations. We have yet to opine as to the scope of this statute. We would like you to enter into us, with us, for an indefinite escrow period. When that's, when we rejected that request, we agreed to provide the commission with a written submission as to our view as to why none of the four components of payments at issue here were covered by Section 1103. GEMSCAR also submitted to the SEC, and I refer you to this document. It's at page 287, or it begins at 287 of the record, and it goes through. You're not suggesting, counsel, that because the SEC didn't agree with your interpretation that that evinces some type of bad faith or misleading behavior on the part of the SEC, are you? It's a tricky question, Your Honor. What I am suggesting, it's a very tricky question for us. What I am suggesting is, we provided a submission to the SEC saying, these aren't extraordinary payments. GEMSCAR provided a submission to the SEC saying, these are the payments that we intend to make, and this is how they were derived, and it lays it out by termination, by vacation pay, by salary, by bonuses. The SEC What's the answer to my question? I'm getting to it, albeit slowly. The SEC, in response to these two submissions, said to us prior to the restructuring, we have a preliminary view, and our preliminary view is that the vacation pay component of your four payments is not extraordinary. Now, don't hold us to that, but that's our preliminary view. Why is this terminology, although new and therefore unfamiliar, extraordinary payments, any different than the other abstractions that courts have been dealing with for hundreds of years and breathing meaning into them? Reckless, negligent, unreasonable with respect to a search and seizure. You have these types of broad words coming out of Congress all the time, and Congress expects the courts then, that's what we do, is to apply the purpose of these. And this isn't, I mean, this, first of all, it only applies to directors, officers, partners, controlling persons, agents, or employees. I mean, it's very clear to whom these payments are directed. And then it says extraordinary. So are courts unable to take a look at the functioning of an organization under investigation and determine whether a payment is extraordinary or not? I think a court probably could determine what or construe extraordinary or ordinary. As this Court found in the Weilert case, extraordinary, or actually I was focusing on there on the word ordinary, but ordinary was meant to include a broad class of payments, you know, which was not simply measured by the particular person in front of it, but by the industry as a whole and what would constitute ordinary business terms, I believe was the phrase in that case. But the Court made clear, this Court made clear that that meant ordinary meant a broad class of things and that extraordinary was a narrow class of things. In that case, they were, I believe the words were aberrational or aberrant or idiosyncratic and that in this case, the SEC seems to turn it on its head in a way. Extraordinary to them is something that's merely unusual because it's large or because it was negotiated. It should be, to the extent it can be interpreted, it should be flipped. The extraordinary should be a very narrow class of things because the result of the statute is you get to freeze potentially for an indefinite period of time a person's money, a person's assets. Well, you say potentially freeze for an indefinite period of time. Are there no time limits? Well, as the statute is currently, as the statute is structured, you are entitled to, based on some showing, a 45-day freeze. Forty-five days, right. You then have a, you can make a showing of good cause, which was not, didn't happen in this case, to get another 45 days. Right. If in the 90-day period or in the 45-day period, as has happened here, you file a complaint, it's essentially an indefinite freeze. The commission's position, the commission's position in the district court when asked this question is that they have to, they do not have to make a different showing. So in other words, in the set, there is provision for a second hearing in Section 1103, though we submit there's little explanation as to what that second hearing is for. But the commission's position is at that second hearing, all they have to do is say we met our burden before the complaint was filed. We have to do nothing more than that. So adopting the commission's position, if they are correct, this is potentially and very easily an indefinite freeze. All they would have to do is file a complaint. And as we know, SEC complaints, once filed, are unreviewable other than for Rule 11. What happens to the assets during this time? What has happened in this case? Generally, what happens in this case? As we understand the statute, what was, was to have happened and did not happen here is that they would be put either in a court-supervised escrow or an escrow with a party, at least unrelated to the allegations at issue. And so this is an interest-bearing case. It's not a case of, you know, the statute requires interest-bearing. It's not a case of interest-bearing in some measure. I believe it is interest-bearing. The statute requires an interest-bearing escrow count, and that's what Judge Byrne ordered, right? Yes. Yes, he did. Was it done? It was an interest-bearing escrow account set up by Gemstar in connection with the restructuring payments. It is now subject to the court supervision, and those payments remained there. You don't have to hear me repeat what's been repeated over and over and over again. There's an enormous public interest involved in something like this. I mean, the economic foundations of the nation, to choose some of the words that I heard on the floor of the Senate, have been shaken by corporations taking advantage and looting themselves and leaving investors and employees and pension funds and everything else flat on the floor. And so what they've tried to do here is come up with a way to enable the enforcement arm to say, we're going to just hold the status quo against this kind of nonsense to make sure that it doesn't occur in the future. I mean, there's an enormous public interest in this. This isn't just something they made up because they didn't have anything better to do. I understand the public interest. And they've asked the courts to take this on and basically to do what we've always done with terms like this, define extraordinary payments to protect everybody's rights, and then make sure that it works that way. I agree with the public interest. I do not agree that that's what happened here. I fully agree with your interpretation of what the legislative history said, which is we are to prove we want to prevent looting. Exactly. We want to prevent executives or whomever else from taking something that you're not entitled to as you depart a company. And how else would you describe that except for extraordinary payments without getting into nickels and dimes that would enable every smart lawyer in the country to run around it as fast as you can say hello and goodbye? Well, I submit, notwithstanding the events of the past few years, that that is an extraordinary event or should be an extraordinary event, that stealing from the company and from ultimately the shareholders is an extraordinary event. That is not what happened here. If there had been any evidence that Dr. Ewan or Ms. Long took something to which they were not previously entitled. But that's the point. They're simply trying to freeze the frame until you can figure that out. How much money went to these people? Millions. And so, I mean, to an ordinary person, and I agree that ordinary person is dangerous because ordinary people hate the company, but these huge payments would look like, wait a minute, here it goes, back door, out the money goes. And so this is simply a, you know, you've heard the arguments. We're just trying to freeze the status quo until we can sort this out. You've got this much money running out the back door. But the status quo for here is indefinite. You know, you say indefinite. I just know from my own experience it's not indefinite. I mean, this thing will be over at some point. It's in an interest-bearing account. It's not a seizure, the SEC says. It's just a temporary hold. But it is a temporary hold based on one, no evidence of the very thing you are talking about. Either a securities laws violation and a connection, a connection of these funds to that violation, or two, even the less focused. Congress says by then it's too late. It's too late. The horse is gone. But the Congress, like everyone else, has certain requirements to import in legislation that they write, you know, the Constitution or at least abide by it. How would you have written this if somebody came to you and said here's what we want to stop? How would you have written this? So it's a very good question, Your Honor. How we interpret it and how we believe it could be enforced is the following. They either put in prima facie evidence of a fraud committed by these individuals, committed by these individuals, that would have the effect of inflating payments or have the effect some way connected to the money at issue, or some corporate governance violation, the sort of thing that happens in the Enron's The World Counts. So you go in and you say these payments, though they look presumptively valid, and that was certainly our position, these payments are presumptively valid. The commission would come in and say they are not presumptively valid, and here's why. I'm going to tell you why. The board was under the thumb of Dr. Ewan. And these are, this is all supposition because there's no proof to this. Dr. Ewan didn't have any agreements by which he was entitled to compensation. Dr. Ewan didn't perform what he said he was supposed to perform in order to get this compensation. Any number, there were probably any number of ways of approaching this notion of extraordinary payments which would be valid. They were not done here. There's no evidence of any of that. The only evidence offered is that this was a five-month negotiation, which we submit as shows presumptive validity. So people were looking at this for five months, and they had a board that was also in the midst of an audit committee investigation looking at this stuff pretty hard, and they appointed a committee of the board specifically for the purpose of looking at these payments. So you want to be careful you're not just fighting the last war. And so you fight the Enron war, and you describe that. Well, then all of a sudden you have new tactical weapons that you're dealing with that you haven't described. Well, you've exceeded your time, but that's fine. It's been very helpful to hear from the other side. Good morning, Your Honors. May it please the Court, my name is Tom Carr, appearing on behalf of the SEC. Following a wave of corporate scandals, Congress enacted Section 1103 to provide the SEC with a limited tool to preserve corporate assets while it quickly completed ongoing investigations. The district court's rulings below appropriately and correctly interpreted that statute and passed constitutional muster and should be affirmed. Didn't you already have those tools by way of the old common law remedy of a temporary restraining order and attachment? Not prior to our filing of a complaint, no, sir.  I'm not saying that you couldn't have gotten a bond. You're the government. You print the stuff. So I'm sure you could get a bond. So why wouldn't that be an adequate remedy? Two things on that, Your Honor. First, the commission's investigation was very intense as was demonstrated in the declaration that was submitted with our Section 1103 application. The commission had already at the time made that application, interviewed or, I'm sorry, taken a testimony of 57 witnesses spanning 105 testimony days. Right. So the commission was working with all speed that it could on this investigation. In those 57 witnesses and 105 days. Was there anyone who testified as to the custom and practice in the industry similar to this and how absurdly over the top these payments were to you and your mom? I'm not aware. Certainly nothing of that sort was ever submitted to judge to Judge Byrne. There was no comparative analysis of other companies in similar markets and other merger acquisition transactions such as occurred between TV Guide and Gemstar. And there was no evidence as to how long the acquired company management usually lasts in this type of situation and what the terms of termination usually are. In other words, what is ordinary to which one could compare these payments to determine if they were extraordinary. There was none of that, was there? Your Honor, I'm not aware of it, but I believe the statute requires that. The question is. Well, the statute requires you to prove that it's extraordinary. How does one prove something is extraordinary without proving as a foundational question what is ordinary? Well, Your Honor, I believe Judge Byrne, in his opinion, noted several factors. You can look at the size of the payments compared to what the person's salary was. You can look at the circumstances. The contract said that they were going to get a termination fee based on a specific multiple of the salary. And the salary would be adjusted by a series of other considerations, a merit bonus, the annual bonus. So that those matters required a great deal of computation, none of which was done. Those those numbers in court were those numbers were a benchmark for a detailed negotiation, whereby Ewan and Leung were to be terminated from their positions as CEO and CFO with Gemstar, following the first in a series of restatements that the company's assets had been overstated by several hundred million dollars, one, two, three on a range, during their tenure. There was no proof of the overstatement of the funds in Judge Byrne's court. That is alleged in your complaint. Correct? You have the information to allege it in the complaint, but you didn't produce any evidence of it in Judge Byrne's court. Correct? Your Honor, that's not correct. When we filed our declaration, when we filed our application, the declaration that came with it attached some financial reports and press releases from Gemstar showing the first in a series of restatements of their financial results. It wasn't all of them, because some of the restatements have occurred since we filed our application. Your Honor. And also attached the employment agreements showing that Ewan and Leung had both salary and bonus provisions that were keyed to those financial results, which had just been thrown out the window. We're going to do the first point here. Section 1103 is not unconstitutionally vague. Yes, Judge Byrne applied the common meaning, the dictionary meaning, but both this and the Supreme Court have repeatedly used that to illuminate the terms of a statute. But what Judge Byrne said was extraordinary is, in his words, and he's quite right, a relative adjective, unquote. What evidence was there in Judge Byrne's court to which he could relate these payments to determine whether they were extraordinary? Relative to their salaries, for example? Yeah. And was there any evidence about what Wombat Industries, let's say, was paying its CEO and CFO and what Wombat Industries, who was a competitor of Gemstar, was terminating? No, Your Honor, but I don't think that would be a particularly helpful factor, because I think you have to focus on the conduct of a particular company. Well, if we're talking about whether it's extraordinary or ordinary or reasonable or unreasonable, one of the ways you prove what's reasonable under the circumstances is what is a custom and practice in the industry at the time and under the circumstances in which we're engaged. Right? I would think a similar way would be available to prove what's ordinary and what's extraordinary. But there was no such proof. Perhaps that would be a factor to consider. But as Judge Byrne said, you cannot have one litmus test. You've got to look at all the factors that might bear on whether or not something is extraordinary. Now, what other factors did Judge Byrne look at other than one? It took five months and several negotiating teams to negotiate the contract. That is extraordinary. What is the basis upon which he said it was extraordinary? What's the ordinary length? What's the ordinary composition of the negotiating team? He said it on the basis, as you just said, of. Isn't that subjective, irreducibly subjective? No, I don't believe it is. Well, where's the objective evidence to which he can compare what happened to say that this was indeed extraordinary? The same question with the largeness of the payment to you and certainly to us. The money is large. We'll stipulate to that. But we're not the finders of fact. The question is, is it large under the circumstances? What were the circumstances to which comparison was made to determine that the payments were large? Your Honor, I'd note that Gemstar filed a Form 8K noting these payments were made. And those payments in a footnote shows that these are matters which are, quote, considered to be important to shareholders. Unquote. Right. Yes. I mean, elsewhere, it's generally understood that a Form 8K is filed to apprise shareholders and the investing public of significant events. Right. So does that show that are extraordinary? Is everything in an 8K? Is there a position that that's been rewritten now so that everything that's in an 8K is now extraordinary? That's my position. This is one factor, one indisputable question. But how is it a factor unless you have the inarticulate premise that it must be significant? Pardon me if I'm interrupting you. You were talking about whether it was unconstitutionally vague. Yes, it was. Thank you. It's axiomatic that mathematical precision is not required in the statute. That is especially true whereas here, Section 1103 is not a criminal statute. It does not reach constitutionally protected conduct, and it imposes no liability or penalties. This Court, even in criminal statutes where a higher threshold or standard of scrutiny is required, has held that terms equally or more subject to interpretation, such as material, reasonable approximation, overwhelmingly, fair and open competition, reasonable variations, and my favorite, characterized by an emphasis, have not been, are not unconstitutionally vague. It's especially true here that the statute should not be held unconstitutionally vague. Well, how about our case of Forbes v. Napolitano where we held it routine, as in routine pathological examinations, was unconstitutionally vague? That's the case that involved, if I recall correctly, abortion rights, which is constitutionally protected conduct, which is subject to a much higher level of scrutiny. No, no, no. It involved investigation from induced abortions after the abortion had taken place. There was no question about limiting the abortion. It was simply a question of limiting the right of investigators to use postpartum fetal tissue. So it didn't have to do with abortion. So let's put that to one side. But if routine, which I take to be ordinary, is unconstitutionally vague, by analogy, not routine or exceptional and extraordinary would be unconstitutionally vague. Well, I'd point out another distinction, Your Honor, which is that this Court and Supreme Court, which is not specificity, as businesses can plan their behavior and can consult with regulators in advance. And, indeed, this Court in Go Leasing, where there was such a consultation, said if there was any concern about ambiguity in the statute, it was resolved by the fact that it was Go Leasing was the party consulted the FAA in advance. Here there was that consultation. Is the SEC entitled to any Chevron deference in connection with its interpretation of what extraordinary payment means? I believe it is. Any statute that we are entrusted with applying, we would be accorded deference. How does that play out in this case? In terms of interpreting extraordinary payments, our interpretation is to be accorded some deference. Well, your interpretation, but not in connection with a particular case. I mean, isn't it your – what is your formal interpretation of this? You know, rulemaking or some statement, definitive statement by the SEC as to how this is to be interpreted? There has not been any rulemaking, Your Honor. That's what I'm after. Because, I mean, you know, a litigation position is something that we say, okay, we don't give you much deference on that. But if you've published something, you've gone through notice and comment and all that kind of stuff, isn't that where Chevron deference comes down? Yes, Your Honor, I believe that's true. You haven't gotten there yet, have you? No, we have not. But again, Your Honor, I would point out that this court in Go Leasing and the other courts with regulated business behavior, it's not just reference to an agency's regulations that further eliminate the vagueness argument. It's the fact that you can consult the regulator. But they did consult the regulator, according to what Ms. Rice told us. And Ms. Rice – and I don't know whether this is part of the record or whether bound by it – she said that the SEC said, we don't know what this means. But would you kindly go into a six-month voluntary freeze, which became less voluntary when the SEC made its desires known to a paying company, Gemstar. Then Gemstar made it voluntary, perhaps involuntary, as far as urine and lung. I'd submit that's not a correct statement of the record. What is the correct statement of the record? Well, the correct statement of the record is that you and me and Gemstar were apprised that we considered all $37 million to be extraordinary payment. It's reflected in the 8K that Gemstar filed, which indicated that all of that money, once the private escrow left, may go into a Section 1103 escrow. The 8K said that all $39 million would go into an 1103? It said all or some of it may go into an escrow pursuant to the Sarbanes-Oxley Act. I believe that's excerpt of record at 8. All or some? Yes. You're falling downhill. You said all. All. And then all of a sudden, some crept in there. What does that mean, some?  I mean, there was always the possibility, though, although we thought all $37 million should be subject to the escrow, that we could agree to waive it for a certain portion. Just as the things we did agree were that their regular periodic salary did continue until they were terminated by the company.  So is your position that even the appellants in this case agree that all or some of those payments should go into an 1103 escrow and they are to some portion at least, if not all, stopped? No, I'm not raising this as a stop-all argument, Your Honor, just that we never told them, no, we're not considering this portion of the $39 million How is the SEC asking us to construe extraordinary payment under these circumstances? Well, Your Honor, I believe we'd say construe it according to its common meaning and that what Judge Burns said is a fair test, that no one litmus test can be used because the second you come up with specific delineations, people are just going to write around that. It's like Justice Stewart's definition of pornography. We know it when I see it. I don't believe that is quite the term, but it certainly is. You go back this afternoon to your folks at the SEC and you say, we had a very interesting discussion in the Ninth Circuit Court of Appeal and this is what we consider to be extraordinary and not extraordinary, so you know what to prosecute from now on and what to go into. And here are the parameters and here are the guidelines. All right. What do you tell me? I believe what I would tell them is that every case is different. It's a case by case analysis. The totality of the circumstances and things like that. I believe I probably also add that you have identified certain comparative factors that you find that you may find important. Ah, so it may be a good idea to compare, as they used to say in the old ever sharp commercials, compare comparison proofs. It may be a good idea to compare what this company was doing as to what other companies were doing to see if what this company was doing was extraordinary as compared to what was ordinary at during the midst of the dot com boom. Right. Perhaps I'd be a good idea. Your Honor, as I said, I believe that what the company does before they're under investigation versus after is perhaps a more telling factor because different companies have different sizes and may have different standard practices based on their industry, their size and who knows what else. Well, certainly all the contracts that were signed by Mr. Young was signed before there was any investigation when they were signing in the Cayman Islands. All right. Excuse me, sir. I mean, it was an offshore corporation. Gemstar was. Oh, those contracts were all signed before there was any investigation. Right. Yeah. But those contracts were not were not the contracts by which the restructuring payments were made. The restructuring. The prior agreements were not used. They may have served as a benchmark for a negotiating. Oh, of course. They were not used. But they started. There were set. There were restructuring payment agreements that superseded all agreements. So those prior standard agreements did not apply here. Let's assume for a second. A legitimate investigation begins. Yes, sir. The focus starts to go on the CEO and the company says it's time for your 20 million dollar golden parachute. Adios. Here's your 20 million dollars pursuant to a contract. We have this five years old with that 20 million dollars going out the back door pursuant to that golden parachute contract. Qualify, in your view, as an extraordinary payment. It could. How? What's extraordinary about it? Extraordinary compared to what? I mean, there's a contract. If anytime you quit or we fire you, you get 20 million dollars. How could that qualify as an extraordinary payment? I mean, it can't be extraordinary compared to the company itself because it's on the books as a contractual legal obligation. It can't be extraordinary compared to the to the universe because everybody has these things amazingly nowadays. For instance, if it is tied to financial performance that was that was overstated or misstated, particularly if that person may have had some complicity with that, then you have to show that there's a there's a connection between that person's actions and a violation of the 34 Act to make it extraordinary. I would agree with you. Well, ultimately, you have I mean, ultimately, you would need to prove once you filed a complaint. But again, we're talking here, at least in the first instance, with the 45 day escrow. So extraordinary compared to what? Extraordinary compared to. May the record reflect a long silence. Extraordinary. Extraordinary. Extraordinary. So you've got to start with ordinary. What's the ordinary that we're comparing comparing it against? Ordinary reference would be, you know, regular salary and benefits. I believe that's what Representative Sensenbrenner said was when you are when you're under investigation that we would freeze, freeze as in not increase the level or not change the level of pay and benefits versus what they were before. So all gore, all golden parachute retreats by CEOs under investigation are extraordinary payments. Well, I would think that a golden parachute by CEO to a CEO under investigation. You know, a reward for their malfeasance certainly should raise some concerns. But is it extraordinary? I would submit that it is. Why is it out of the ordinary? Everybody has these things and the company's had it as a legal obligation on the book. It's not against public policy. It's a perfectly valid contract. Because Congress's purpose here was if there are payments where they are out of the ordinary in any way. Out of the ordinary. What's the ordinary? Where do you start? There are payments where payments where it's different from regular periodic salary and benefits, and there may be other factors that make it more or less extraordinary, but as a starting point that. Well, then you would say that any money. Where that money, if, you know, there is suspicion of violations, where if there are violations, that money would serve as relief to preserve corporate assets in order so that investors of the corporation may get that money back. But that's not what the statute says. Now you're beginning to show a likelihood of success and probable cause to believe that. And you also use the word suspicion. That is not a basis upon which to seize assets under Colello, Judge Pius's district court opinion. He happens to be with us now. And I think you probably feel the same way. Suspicion is, don't you have to show probable cause in order to take a person's property away from them? No, Your Honor. In this situation, I believe you don't. First, we're not taking property away. It's being temporarily escrowed with regard to the 45-day complaint. But that 45 days has been over a year now, hasn't it? Because in the interim, we filed a complaint. Do you have a trial date? I do not believe we have a trial date yet. But, Your Honor, the court can – the district court continued the escrow at that point and without objection from the defendants and – well, I guess the defendants are interveners here. And they did not raise a Fourth Amendment argument below. Can't we take consideration of the Fourth Amendment argument here? It's strictly a legal question. The facts aren't clear. I don't believe it is, Your Honor. Your Honor, I believe that had the argument been raised below that you need to show some Fourth Amendment – some level, whether it be probable cause or reasonable suspicion, that the commission – although, again, I don't believe probable cause would be the standard here – would have been able to present any evidence it could to show that there was a reasonable suspicion or probable cause. We did not do that because it was not raised. Counsel, for Fourth Amendment purposes, is it your view that the interveners had a possessory interest in the proceedings? No. It is not. According to the – according to the termination agreements, the monies were retained by Gemstar and remained the property of Gemstar. So there's no standing? I believe there's no standing, Your Honor. You – you ask us to adopt a definition that I guess Judge – the judge in the district court adopted of extraordinary as out of the ordinary or unusual. Is that right? Yes, Your Honor. It's – I hope that doesn't sound like a trick question. But then my mind ratchets down to, okay, what does ordinary mean and what does usual mean? How do we figure out what ordinary means and what usual means? Well, the fact that extraordinary occurs in the – occurs in the statute with compensation or otherwise should, one, show that compensation can be extraordinary. And also, as legislative history shows, they're concerned with changes from regular – from regular salary and benefits. They're also concerned about cases where – I believe this was Representative Baker – where someone has manipulated the – manipulated the books and benefited, which was a possibility when we filed the 45-day complaint, but was also the reality when we submit when we filed our complaint alleging precisely that. So is it your position that any termination payment is extraordinary? Yeah. Sounds like it. Because it's not a regular salary. I can't say that every termination payment would, but it's certainly a termination payment while you're under suspicion I think would raise red flags. So that's – that's out of the ordinary because it's not a regular salary or bonus payment. Yes. Because then once you – Particularly here when it's been a negotiation that is basically pre-settling litigation before the litigation has started, where everyone in the world needs to lawyer up and you need – and you get a special committee just to decide what their termination payment is going to be. Well, I hope you don't say that the retention of counsel is extraordinary and not ordinary. There's a lot of lawyers in this courtroom. I understand that, Your Honor. One last point on the Fourth Amendment, since I see I'm rather over time. That's okay. It's all – go ahead. We'll stop you when you're not making any sense. I'll take that as a compliment that you stopped me already. Probable – even if – if Ewen and Leon had standing on the Fourth Amendment, their sole argument is that probable cause was required, and that's not the case here. Probable cause is particularly applicable to cases in the criminal sphere. I believe this Court in the Kincaid case, which they cite, you know, talks in terms of – Kincaid's gone. It's been taken in back. Okay. Never mind that. But even before you – See how quickly we stop you? Thank you. But at least at this instance, not because I'm not making sense. In cases other than cases where you're doing the solving, where the seizure is done for purposes other than the solving or punishing of crime, a lesser standard than probable cause, including in several cases, no requirement of individual suspicion whatsoever, has been held to be appropriate. The Supreme Court in Earls said that probable cause is peculiar to the criminal context. Here – here, the escrow, both temporary and permanent, do not – are not used to solve or punish criminally or even civilly. They're purely to provide preservation of assets that if liability is found under a separate statute, that there will be that money available to serve as relief. Thank you, Counsel. Thank you. Even though you're over time, we'll let you respond, too, so long as you say something that's useful. Kincaid is gone, by the way, so. Okay. Thank you. To address the SEC's statement to that, there is no – that there's nothing in the record concerning the negotiations with the SEC prior to the closing of the restructuring. Let me refer the report to the pages 15 through 23 of the excerpts of record, which is the Declaration of Stanley Arkin, which goes in detail into the negotiations with the SEC and as well the SEC's statement to us prior to the closing of it that it was not an extraordinary one. To address the SEC's position that there was evidence of the fraud or a violation of securities laws in the record because they put in press releases from Gemstar stating that restatements had occurred, I note that that's not evidence of anything other than that there was a restatement. It's not evidence that securities laws were violated. It's not evidence that my clients had anything whatsoever to do with the fraud. No. I mean, your client Leung was the chief financial officer and your client U.N. was the chief executive officer. I mean, were they potted palms? No, Your Honor, but restatements can be made for any number of reasons, many of which would have nothing whatsoever to do with a violation of securities laws. It may be, but it's certainly circumstantial evidence to be followed up. And had they presented and followed up and provided the additional proof connecting my clients to a violation and connecting these funds to the violation as well, then the record might have actually demonstrated that. I'd like to address a quick point that when asked about how he defines extraordinary, I think it's important to point out, or how the commission would find extraordinary, it's important to point out the only other proceeding that we can find that's been brought under Section 1103, which has been brought in New York, and it's the Vivendi proceeding. And in that proceeding, they similarly were seeking an escrow against Vivendi's former chief executive officer, Mr. Messier. And in the Vivendi proceeding, the SEC's position was, one, Section 1103 requires proof of an improper payment, a position that they are not taking here. Two, the position there was the reason the payment to the payments about to be made to Mr. Messier were extraordinary was because they hadn't been approved. One of the reasons was because they were large. Kennedy. Let me stop you. Didn't you ask to take judicial notice of this? I did. And wasn't it denied? As far as I know, it was granted. No, no. The motion to amend was granted. No, the motion to amend certainly was granted. It was granted, but the motion to ‑‑ We are unaware of that, Your Honor. If that's the case, I will ‑‑ Yeah. I am unaware of that. Unawareness is bliss. But it was a good argument. But if indeed it was denied, Your Honor, I will move on. All right. And the reason it was denied was because the statements of prosecuting attorneys in one case certainly don't make the law for another case. I understand that they are not necessarily bound by their statements in that case, but it does point out an interesting problem. If the fact that the board approved it here makes it extraordinary and the fact that the board did not approve it in Vivendi makes it extraordinary, it is ‑‑ there is some concern that it's either ‑‑ there either is no definition for extraordinary or it's not ‑‑ Board approval is irrelevant. Or maybe it's irrelevant. But it doesn't ‑‑ it's not helpful in determining the extraordinary nature of the payment. What's the amount of the cash payments specified in the agreement? For each of the components, Your Honor? Total. The total. It's nearing $38 million. $38 million. For the two people. And that's for unused vacation days. Oh, no, no, no, no. No. Pretty good vacation days. Yeah. I will ‑‑ There's actually two components to the $38 million. Right. There's $7 million. Well, there are four components. You can answer that, counsel. Anne first. Accrued unused vacation pay, accrued unpaid salary and accrued unpaid bonuses. Those total up to $8.2 million. And the termination fee is $27 million. Right. It's totaled for you. Gwen has almost $2 million in unused vacation. Right. And what was this ‑‑ what were his vacation entitlements in his position? He was entitled to carry over, if you will, and ultimately be paid for a certain amount of days of vacation. I believe it was 60 days. It's calculated by reference to his then existing base salary. And if I can refer you to pages 292 and 293 of the record, the excerpts of the record, Your Honor. It's detailed there. And this is the document, by the way, that was provided to the SEC on October 11th, before they commenced their investigation, the formal investigation, and one month prior to the closing of the restructuring. So the SEC had this information in their possession one month prior to the restructuring closing, which brings me to actually a point that I believe Judge Rawlinson raised earlier as to whether or not we were arguing that the SEC was acting in bad faith. What we are arguing is all of the reasons that they claim today that make these payments extraordinary are all reasons known to them back in October when they received this information. Nothing has changed. Judge Trott asked a question that I don't think has been fully answered by you, which is this. Every week we get a new ruling as to what punitive damages are excessive or not as a matter of law. And the courts seem to have a lot of difficulty, but they do it anyway. They determine what's excessive. Excessive sounds pretty much like extraordinary, right? Why can't we give that word meaning extraordinary in this case? If we can find it excessive in a jury verdict, why can't we find extraordinary here? To the extent that that satisfies any constitutionality concerns, you could certainly import that into the statute. They haven't shown that here, but what's not clear from the legislative history is whether they were targeting excessive compensation. They seem to be targeting stolen monies or looted monies, but it seems to us that would to, and to more fully respond to your question earlier, that you do have the power to read certain requirements or certain procedural requirements into the statute insofar as you're expected to interpret a statute to take account of the constitutional protections afforded by the Fourth Amendment, in this case, Fifth Amendment. This is why you – this would form the foundation for reading in such requirements, preliminary injunction requirements for such thing. If I can quickly address the Fourth Amendment concern, although I probably shouldn't give short shrift to the Fourth Amendment. But to answer Judge Rawlinson's question, Ewan and Lung most certainly had a possessory interest in these monies. Wholly aside from the fact that they would never have entered into this agreement, if the SEC had taken the position back in October that we interpreted extraordinary payments to be unusual payments, we interpreted that to be based – we based that on a definition in a dictionary, and the fact that you're entitled to them under the previous contracts, that never would have occurred. But even had it occurred, we entered into a 6-month escrow with the company, during which time – this is not the 1103 escrow, but there was an escrow arrangement with the company, during which time the SEC agreed that they would speak to us about releasing payments that we would get. But didn't the – wasn't the agreement that the money would remain the property of Jim Starr until certain events occurred? As – and admittedly, there is an ambiguity here, but as a – as a custodian of the funds. The agreements also say Jim Starr paid the money. They already paid the money, and you had to pay the money to effect the restructuring. So they were going to hold the funds. That was – the SEC, by the way, and that's in the record as well, insisted upon that condition, that language in the side letter, regardless of the ambiguity. They insisted upon the titled language in there. We submit that means, as custodian, we also submit that the agreement doesn't permit Jim Starr to have that money. There is a section, a no-offset section, which says Jim Starr cannot use the money in this escrow for any reason, any claim, anything whatsoever. Indeed, it says even all the interest in there goes to you in the loan. So, yes, there is an ambiguity in these agreements when it says that title doesn't pass, but we submit it's because Jim Starr was acting – by paying in – by paying it into the escrow, they satisfied their obligations. By holding it in the escrow, they had a custodial obligation and nothing more than that. The district court seems to have thought it was relevant that all of this stuff was reported in an 8K filing. Does that add anything to the district court's analysis in your view? We think not. As Justice Beyes said – Judge Beyes said, it means that they viewed it as important that these – that this occurred. Important to security holders. Important to shareholders. This is true, in compliance with their disclosure obligations. They also reported things like there is a hearing today. When we had the May 6th hearing on the loan with Judge Byrne, that was also reported in an 8K. Because it wasn't ordinary. Because it was important to the shareholder. Okay. All right. Well, we've taken a lot of time with this, but it's a difficult issue and an interesting one, and you've all helped us very much. Case just argued as ordered, submitted. We'll be in recess until tomorrow morning.
judges: Trott, Rawlinson, Bea